# IN THE SUPREME COURT OF TEXAS

No. 15-0688

JACK PIDGEON AND LARRY HICKS, PETITIONERS,

v.

MAYOR SYLVESTER TURNER AND CITY OF HOUSTON, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued March 1, 2017**

JUSTICE BOYD delivered the opinion of the Court.

The trial court denied the City of Houston's and its Mayor's pleas to the jurisdiction and issued a temporary injunction prohibiting them from "furnishing benefits to persons who were married in other jurisdictions to City employees of the same sex." While their interlocutory appeal was pending in the court of appeals, the United States Supreme Court held that states may not "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Obergefell v. Hodges*, — U.S. —, 135 S. Ct. 2584, 2605 (2015). The court of appeals then reversed the temporary injunction and remanded the case to the trial court for further proceedings.

Petitioners Jack Pidgeon and Larry Hicks contend that the court's opinion and judgment impose—or at least can be read to impose—greater restrictions on remand than *Obergefell* and this Court's precedent require. We agree. We reverse the court of appeals' judgment, vacate the

trial court's orders, and remand the case to the trial court for further proceedings consistent with our opinion and judgment.

## I.
## Background

The "annals of human history reveal the transcendent importance of marriage." *Obergefell*, 135 S. Ct. at 2593–94. "Since the dawn of history, marriage has transformed strangers into relatives, binding families and societies together." *Id.* at 2594. For thousands of years, both the role of marriage and its importance to society were founded on the "understanding that marriage is a union between two persons of the opposite sex." *Id.* Until only recently, "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization." *United States v. Windsor,* — U.S. —, 133 S. Ct. 2675, 2689 (2013).

While "most people" have shared that view, others have not. In the early 1970s, for example, two men obtained a Texas marriage license when one of them appeared before the county clerk dressed as a woman. *See* James W. Harper & George M. Clifton, Comment, *Heterosexuality; A Prerequisite to Marriage in Texas?*, 14 S. TEX. L.J. 220, 220 (1972–73). In response, the Texas Legislature amended the Texas Family Code to expressly provide that a marriage license "may not be issued for the marriage of persons of the same sex." *See* Act of June 15, 1973, 63rd Leg., R.S., ch. 577, § 1, 1973 Tex. Gen. Laws 1596, 1596–97 (amending former Texas Family Code section

1.01). Texas thus became the second state in the Union[1] to adopt what is often referred to as a "defense of marriage act" (DOMA).[2]

In response to early lawsuits, courts throughout the United States consistently rejected legal challenges to the historical understanding of marriage.[3] Beginning in the 1990s, many other states and the federal government[4] enacted DOMAs to amend their statutes[5]—and in some states, their constitutions[6]—to preserve the traditional view of marriage. Around the same time, however, other

---

[1] A few weeks earlier in 1973, Maryland adopted a statute providing that "[o]nly a marriage between a man and a woman is valid in this state." *See* 1973 Md. Laws 574 (enacting former MD. CODE art. 62, § 1 (1973)).

[2] For simplicity's sake, we use the acronym DOMA to refer generically to legislation intended to limit marriage to one man and one woman or otherwise defend or promote that historical view. In actuality, the laws we refer to as DOMAs include a variety of provisions and address the subject in different ways.

[3] *See, e.g.*, *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982) (holding federal statute limited marriage to one man and one woman and did not violate federal constitution); *Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995) (holding D.C. statute did not authorize same-sex marriage and did not violate federal constitution); *Jones v. Hallahan*, 501 S.W.2d 588, 590 (Ky. 1973) (holding state statute limited marriage to "the union of a man and a woman" and did not violate federal constitution); *Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971) (holding state statute limited marriage to two persons of the opposite sex and did not violate federal constitution), *appeal dism'd*, 409 U.S. 810, 810 (1972) (dismissing appeal "for want of a substantial federal question"); *Anonymous v. Anonymous*, 325 N.Y.S.2d 499, 500 (1971) ("The law makes no provision for a 'marriage' between persons of the same sex.").

[4] Congress passed the federal Defense of Marriage Act in 1996, and then-President Clinton signed it into law. *See* Pub. L. No. 104-199, Sept. 21, 1996, 110 Stat. 2419. The federal DOMA had two key sections. First, it provided that no state "shall be required to give effect to" any other state's legal recognition of "a relationship between persons of the same sex that is treated as a marriage" or "a right or claim arising from such relationship." *Id.* § 2(a) (codified at 28 U.S.C. § 1738C (1996)). Second, it provided that when used in any federal law, "the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." *Id.* § 3(a) (codified at 1 U.S.C. § 7 (1996)).

[5] *See, e.g.*, ALA. CODE § 30-1-19 (1998); ALASKA STAT. § 25.05.013 (1996); ARIZ. REV. STAT. § 25-101(C) (1996); ARK. CODE § 9-11-109 (1997); CAL. FAM. CODE § 300 (1992); COLO. REV. STAT. § 14-2-104(1)(b) (2000); FLA. STAT. §§ 741.04(1), .212 (1997); GA. CODE § 19-3-3.1 (1996); HAW. REV. STAT. § 572-1 (1985); IND. CODE § 31-11-1-1 (1997); IOWA CODE § 595.2(1) (1998); KAN. STAT. §§ 23-2501, -2508 (1996); KY. REV. STAT. §§ 402.005, .020(1)(d), .040, .045 (1998); LA. CIV. CODE arts. 89, 3520(B) (1999); MICH. COMP. LAWS § 551.1 (1996); MISS. CODE. § 93-1-1(2) (1997); MO. ANN. STAT. § 451.022(2), (3) (1996); MONT. CODE § 40-1-401(1)(d) (1997); N.C. GEN. STAT. §§ 51-1, -1.2 (1995); N.D. CENT. CODE §§ 14-03-01, -08 (1997); OHIO REV. CODE § 3101.01 (2004); OKLA. STAT. tit. 43, § 3.1 (1997); 23 PA. CONS. STAT. § 1704 (1996); S.C. CODE § 20-1-15 (1996); S.D. CODIFIED LAWS § 25-1-1 (1996); TENN. CODE § 36-3-113 (1996); UTAH CODE §§ 30-1-2(5) (1977), -4.1 (2004); VA. CODE § 20-45.2 (1997); W. VA. CODE § 48-2-603 (2001); WYO. STAT. § 20-1-101 (1977).

[6] Twenty-three states passed constitutional amendments in addition to statutory provisions. *See* ALA. CONST. art. I, § 36.03; ALASKA CONST. art. I, § 25; ARIZ. CONST. art. XXX, § 1; ARK. CONST. amend. LXXXIII, § 1; CAL.

states' courts became more receptive to legal and constitutional challenges to laws restricting marriage to the historical view.[7] Soon, some state legislatures began amending their laws to expressly permit and recognize same-sex marriages, and more courts began invalidating laws that did not.[8]

In 2013, the United States Supreme Court held in a 5-4 decision that the federal DOMA's provision defining the terms "marriage" and "spouse" to apply only to opposite-sex couples violates "basic due process and equal protection principles applicable to the Federal Government." *Windsor*, 133 S. Ct. at 2693 (citing U.S. CONST. amend. V; *Bolling v. Sharpe*, 347 U.S. 497 (1954)). The Court noted that by then, twelve states and the District of Columbia had "decided that same-sex couples should have the right to marry and so live with pride in themselves and their union and in a status of equality with all other married persons." *Id.* at 2689.

---

CONST. art. I, § 7.5; COLO. CONST. art. II, § 31; FLA. CONST. art. I, § 27; GA. CONST. art. I, § 4, ¶ I; HAW. CONST. art. I, § 23; KAN. CONST. art. XV, § 16; KY. CONST. § 233A; LA. CONST. art. XII, § 15; MICH. CONST. art. 1, § 25; MISS. CONST. art. 14, § 263A; MO. CONST. art. I, § 33; MONT. CONST. art. XIII, § 7; N.C. CONST. art. XIV, § 6; N.D. CONST. art. XI, § 28; OHIO CONST. art. XV, § 11; OKLA. CONST. art. II, § 35; S.C. CONST. art. XVII, § 15; S.D. CONST. art. XXI, § 9; TENN. CONST. art. XI, § 18; TEX. CONST. art. I, § 32; VA. CONST. art. I, § 15-A. Six additional states passed constitutional amendments without enacting a statutory provision. *See* IDAHO CONST. art. III, § 28; NEB. CONST. art. I, § 29; NEV. CONST. art. I, § 21; OR. CONST. art. XV, § 5a; UTAH CONST. art. I, § 29; WIS. CONST. art. XIII, § 13.

[7] *See, e.g.*, *Baker v. State*, 744 A.2d 864, 886 (Vt. 1999) (holding that the Vermont Constitution's common-benefits clause requires state to provide "the same benefits and protections" to same-sex couples as to "married opposite-sex couples"); *Brause v. Bureau of Vital Statistics*, No. 3AN-95-6562 CI, 1998 WL 88743, at *6 (Alaska Super. Ct. Feb. 27, 1998) (mem. op.) (requiring state to show compelling reason to ban same-sex marriage); *Baehr v. Lewin*, 852 P.2d 44, 67 (Haw. 1993) (plurality op.) (holding Hawaii statute potentially violated Hawaii Constitution's equal-protection clause and was subject to "strict scrutiny," meaning it was unconstitutional unless it was "justified by compelling state interests" and was "narrowly drawn to avoid unnecessary abridgements of the [plaintiffs'] constitutional rights").

[8] *See, e.g.*, DEL. CODE tit. 13, § 129 (2013); D.C. CODE § 46-401 (2009); MD. CODE, FAM. LAW § 2-201 (2012); MINN. STAT. § 517.01 (2013); N.H. REV. STAT. ANN. § 457:1-a (2009); N.Y. DOM. REL. LAW § 10-a (2011); 15 R.I. GEN. LAWS § 15-1-1 (2013); VT. STAT. ANN. tit. 15, § 8 (2009); WASH. REV. CODE § 26.04.010 (2012); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Lewis v. Harris*, 908 A.2d 196 (N.J. 2006); *Goodridge v. Dept. of Pub. Health*, 798 N.E.2d 941 (Mass. 2003).

In the Court's view, the federal DOMA definitions did not merely preserve the traditional view of marriage. Instead, their "avowed purpose and practical effect [were] to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of [the] States." *Id.* at 2693. Concluding that "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom [a state], by its marriage laws, sought to protect in personhood and dignity," the Court found the federal definitions unconstitutional. *Id.* at 2696.

Based on *Windsor*, the City of Houston city attorney advised then-Mayor Annise Parker that the City "may extend benefits" to City employees' same-sex spouses who were legally married in other states "on the same terms it extends benefits to heterosexual spouses." In the attorney's opinion, refusing to provide such benefits would "be unconstitutional." Relying on this advice, on November 19, 2013, Mayor Parker sent a memo to the City's human-resources director "directing that same-sex spouses of employees who have been legally married in another jurisdiction be afforded the same benefits as spouses of a heterosexual marriage." The City began offering those benefits soon after the Mayor issued her directive.

A month later, on December 13, 2013, Pidgeon and Hicks[9] filed suit against the City and the Mayor[10] in state court (*Pidgeon I*), challenging the Mayor's directive and the City's provision

---

[9] Except when helpful to distinguish the two, we will generally refer to Pidgeon and Hicks collectively as Pidgeon.

[10] Except when helpful to distinguish the two, we will generally refer to the Mayor and the City collectively as the Mayor. Pidgeon sued Mayor Parker in her official capacity, as is required for an *ultra-vires* action. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009). Mayor Parker's term ended on January 2, 2016, and Sylvester Turner took office on that date. When a public officer who is sued in an official capacity ceases to hold office before an appeal is resolved, her successor in office is automatically substituted as a party. TEX. R. APP. P. 7.2(a). Although Mayor Turner did not initially issue the directive, he has expressed no intent to withdraw it and has continued to defend it in this appeal.

of benefits pursuant to that directive. The Mayor removed *Pidgeon I* to federal court, which ultimately remanded it back to state court. But by then, the state court had apparently dismissed the suit for want of prosecution. Instead of challenging the dismissal of *Pidgeon I*, Pidgeon and Hicks reasserted their claims by filing this suit (*Pidgeon II*) on October 22, 2014.

Pidgeon and Hicks alleged that they are Houston taxpayers and qualified voters, that the City is "expending significant public funds on an illegal activity," and that the Mayor's directive authorizing those expenditures violates Texas's and the City's DOMAs. Specifically, prior to *Windsor*, the City had amended its charter, and the State had amended the Texas Family Code and the Texas Constitution, to more forcefully preserve the traditional view of marriage:

- In 2001, the City's voters signed and then approved a petition to amend the City's charter to provide that, except "as required by State or Federal law, the City of Houston shall not provide employment benefits, including health care, to persons other than employees, their legal spouses and dependent children." CITY OF HOUSTON CHARTER art. II, § 22. Although this language did not expressly refer to same-sex relationships, the voters' intent to deny tax-funded employment benefits to same-sex partners was undisputed, as reflected in the title the City itself gave to the new provision: "Denial of Benefits to Same-Sex Partners and Related Matters."[11]

- In 2003, the Texas Legislature amended the Family Code to expressly provide that (1) any "marriage between persons of the same sex . . . is contrary to the public policy of this state and is void in this state"; and (2) the state or any agency or political subdivision "may not give effect to" any "right or claim to any legal protection, benefit, or responsibility asserted as a result of a marriage between persons of the same sex . . . in this state or in any other jurisdiction," TEX. FAM. CODE § 6.204(b), (c)(2) (2003). *See* Act of May 14, 2003, 78th Leg., R.S., ch. 124, § 1, 2003 Tex. Sess. Law Serv. 124.

- In 2005, two-thirds of the Texas Senate and House approved a joint resolution to amend the Texas Constitution to expressly provide that:

---

[11] *See also* "City Voters Reject Same-Sex Benefits," HOUS. CHRON. (Nov. 7, 2001), http://www.chron.com/news/houston-texas/article/City-voters-reject-same-sex-benefits-2072330.php ("Gay rights . . . was the burning issue.").

6

> (a)     Marriage in this state shall consist only of the union of one man and one woman[, and]
>
> (b)     This state or a political subdivision of this state may not create or recognize any legal status identical or similar to marriage.

Act effective Nov. 11, 2005, 79th Leg., R.S., Tex. Gen. Laws 5409. Later that year, over 76% of Texas voters approved the proposition.[12] *See* TEX. CONST. art. I, § 32.

Pidgeon alleged that these DOMAs remained valid and enforceable despite *Windsor* because *Windsor* addressed only the *federal* DOMA and its impact on persons married in states that had elected to allow same-sex marriages. In Pidgeon's view, *Windsor* merely required the federal government to acknowledge marriages the various states may recognize; it did not require Texas or any other state to license same-sex marriages or recognize same-sex marriages performed in other states. Pidgeon sought unspecified actual damages as well as temporary and permanent injunctive relief prohibiting the City from providing benefits to same-sex spouses of employees married in other jurisdictions.

The Mayor and City filed pleas to the jurisdiction asserting governmental immunity and challenging Pidgeon's standing to assert his claims.[13] The trial court denied the pleas and granted Pidgeon's request for a temporary injunction prohibiting the Mayor "from furnishing benefits to persons who were married in other jurisdictions to City employees of the same sex." The Mayor immediately filed this interlocutory appeal challenging both the order denying the pleas to the jurisdiction and the order granting the temporary injunction.

---

[12] *See* OFFICE OF THE SEC'Y OF STATE, RACE SUMMARY REPORT: 2005 CONSTITUTIONAL AMENDMENT ELECTION (2005), http://elections.sos.state.tx.us/elchist117_state.htm.

[13] The City challenged Pidgeon's standing to assert any of his claims against the City, but the Mayor initially challenged only his standing to sue her for damages and attorney's fees. She later filed a supplemental plea challenging all of Pidgeon's claims. The trial court heard and ruled on all of the challenges together.

Meanwhile, courts across the country were hearing other lawsuits challenging the constitutionality of various state DOMAs. In *Obergefell*, the United States Supreme Court consolidated and agreed to hear five of those cases, in which the plaintiffs alleged that their states' laws denying same-sex couples the right to marry or prohibiting recognition of the legal validity of a same-sex marriage from another state violate the federal Constitution. 135 S. Ct. at 2593. On June 26, 2015—while this case (*Pidgeon II*) remained pending on interlocutory appeal before the Texas court of appeals—the United States Supreme Court issued its decision in *Obergefell*. *Id.* at 2608.

In another 5-4 decision, the Court concluded in *Obergefell* that the state DOMAs at issue violate "the Due Process and Equal Protection Clauses of the Fourteenth Amendment." *Id.* at 2604. Based on that conclusion, the Court held that the states may not "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples," and may not "refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Id.* at 2605.

The Mayor then filed a supplemental brief in the court of appeals, arguing that *Obergefell* required the court to reverse the injunction. In response, Pidgeon argued that even if *Obergefell* requires Texas to license and recognize same-sex marriages, it does not require "states to pay taxpayer-funded benefits to same-sex relationships." According to Pidgeon, *Obergefell* did not resolve his claims because federal courts cannot "commandeer state spending decisions."

On July 28, 2015, the court of appeals reversed the trial court's temporary injunction. 477 S.W.3d 353, 355 (Tex. App.—Houston [14th Dist.] 2015). In a brief *per curiam* opinion, the court recited *Obergefell*'s holdings that "same sex couples may exercise their fundamental right to marry

in all States," and that "there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Id.* at 354 (quoting *Obergefell*, 135 S. Ct. at 2604–05, 2607–08). Noting "the substantial change in the law regarding same-sex marriage since the temporary injunction was signed," the court reversed the injunction and remanded the case to the trial court for further proceedings. *Id.* at 355. We granted Pidgeon's petition for review.[14]

## II.
## Our Jurisdiction

We must first determine whether we have jurisdiction to review the court of appeals' interlocutory decision. The Mayor appealed from the trial court's orders denying her plea to the jurisdiction and granting the temporary injunction. Texas law permits interlocutory appeals from such orders, *see* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4), (8), but currently, this Court's jurisdiction over interlocutory appeals "is limited." *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 71 (Tex. 2016) (citing TEX. GOV'T CODE § 22.001(a)(1)).[17] We may only review the appellate court's interlocutory decision if (1) one or more justices dissented in the court of appeals,

---

[14] Both before and after we granted review, we received numerous amicus curiae briefs urging us to consider the case and expressing various views on how we should rule. In support of Pidgeon, we received amicus briefs from one Texas Railroad Commissioner, eleven Texas Senators, forty Texas Representatives, and four then-candidates for the Texas Legislature; fifteen "Conservative Leaders throughout Texas," the U.S. Pastor Council, and Texas Leadership (aka the Texas Pastor Council); the Texas Governor, Lieutenant Governor, and Attorney General; and the Foundation for Moral Law and the Institute for Creation Research. In support of the Mayor, we received amicus briefs from Kenneth L. Smith; the International Municipal Lawyers Association and the Texas Municipal League; Lawyers for America; twenty-six Texas constitutional-law and family-law professors; L.J. and M.P., a Married Couple, and Equality Texas; the *De Leon* plaintiffs; the Anti-Defamation League; GLBTQ Legal Advocates & Defenders, Lambda Legal Defense and Education Fund, Inc., the National Center for Lesbian Rights, the American Civil Liberties Union of Texas, and the American Civil Liberties Union Foundation; and three "scholars who study same-sex couples and their families." We also received numerous emails, letters, and postcards expressing a wide variety of views, which we have treated as amicus briefs.

[17] The Legislature recently removed these and other limitations on our jurisdiction, but that change is not effective until September 1, 2017. Act of May 19, 2017, 85th Leg., R.S., ch. ___, § 1, 2017 Tex. Gen. Laws ___, ___.

or (2) the court of appeals "holds differently from a prior decision of another court of appeals or of the supreme court." TEX. GOV'T CODE § 22.225(c) (incorporating TEX. GOV'T CODE § 22.001(a)(1)–(2)). One court "holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Id.* § 22.225(e).

Pidgeon argues that the court of appeals' decision in this case creates an inconsistency that should be clarified. In its opinion, the court recited not only the Supreme Court's holdings in *Obergefell*, but also the United States Fifth Circuit Court of Appeals' holdings in a case called *De Leon v. Abbott*. *See* 477 S.W.3d at 354–55 (citing *De Leon v. Abbott*, 791 F.3d 619, 624–25 (5th Cir. 2015)). Concluding that both decisions created a "substantial change in the law regarding same-sex marriage since the temporary injunction was signed," the court reversed the temporary injunction and remanded the case to the trial court "for proceedings consistent with *Obergefell* and *De Leon*." *Id.* at 355. Pidgeon contends that the court's requirement that the trial court proceed "consistent with" *De Leon* conflicts with our previous decisions holding that Fifth Circuit decisions are not binding on Texas courts. *See, e.g.*, *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (holding that while "Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, . . . they are *obligated* to follow only higher Texas courts and the United States Supreme Court").

The Mayor agrees that *De Leon* is not binding on the trial court but contends that the court of appeals did not hold that it was. According to the Mayor, the court of appeals "did not rule on how *Obergefell* and *De Leon* affect the ultimate outcome of [Pidgeon's] claims," and instead

10

"simply reversed the temporary injunction based on the change in the law and remanded to the trial court, in the interest of justice, for proceedings consistent with those cases."

We agree with the Mayor that the trial court *could* read the court of appeals' opinion to hold merely that the trial court should consider *De Leon* as a persuasive authority when addressing Pidgeon's arguments. As the Mayor notes, the court of appeals suggested that it was remanding the case "in the interest of justice" because the case "has not been fully developed." 477 S.W.3d at 355 n.3 (citing TEX. R. APP. P. 43.3(b); *Ahmed v. Ahmed*, 261 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Chrisman v. Brown*, 246 S.W.3d 102, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). But without our review, Pidgeon has no assurance that the trial court *would* read the court of appeals' opinion that way. The court of appeals did not instruct the trial court to proceed "in light of" or "considering" *De Leon*. Instead, it instructed the court to proceed "consistent with" *De Leon*. We conclude that the court of appeals' language gives rise to the type of "unnecessary uncertainty in the law and unfairness to litigants" that our conflicts jurisdiction allows us to clarify. *See* TEX. GOV'T CODE § 22.225(e). We thus conclude that we have jurisdiction over this interlocutory appeal. *See Harry Eldridge Co. v. T.S. Lankford & Sons*, *Inc.*, 371 S.W.2d 878, 879 (Tex. 1963) ("[W]hen our jurisdiction is properly invoked as to one point set forth in the application for writ of error, we acquire jurisdiction of the entire case.").

### III.
### Arguments and Requested Relief

We now turn to Pidgeon's substantive arguments. Pidgeon does not argue that the court of appeals erred by dissolving the temporary injunction and remanding the case to the trial court. Instead, he contends that the court of appeals (A) should not have instructed the trial court to conduct further proceedings "consistent with" *De Leon*; (B) should not have reversed the

11

temporary injunction, but instead should have vacated or dissolved it; and (C) should have affirmed the temporary injunction "to the extent" it required the City to "claw back" benefits the City provided to same-sex spouses before *Obergefell*. In addition, he (D) urges us to instruct the trial court to "narrowly construe" *Obergefell* on remand. We address each argument in turn.

**A**     *De Leon*

Pidgeon first argues that by instructing the trial court to conduct further proceedings "consistent with" the Fifth Circuit's decision in *De Leon*, the court of appeals' opinion could be misread to mean that *De Leon* is binding on the trial court. Whether *De Leon* is binding is crucial to Pidgeon's case because unlike *Obergefell*, *De Leon* specifically held that the Texas DOMAs violate the federal Constitution and cannot be enforced. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 666 (W.D. Tex. 2014), *aff'd sub nom.*, *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015). We agree with Pidgeon that the court of appeals should not have ordered the trial court to proceed on remand "consistent with" *De Leon*.

Two same-sex couples filed *De Leon* in federal court in San Antonio in 2013, shortly after *Windsor* issued. They sued the Texas Governor, the Texas Commissioner of the Department of State Health Services, and the Bexar County Clerk (collectively, the Governor), challenging the constitutionality of the Texas DOMAs under the federal Constitution. The federal district court enjoined the Governor from enforcing the Texas DOMAs, holding that "Texas' prohibition on same-sex marriage conflicts with the United States Constitution's guarantees of equal protection and due process," 975 F. Supp. 2d at 639, and "Texas' refusal to recognize . . . out-of-state same-

12

sex marriage[s] violates due process," *id.* at 662. The Governor[15] promptly appealed the injunction to the Fifth Circuit, where it remained pending until the Supreme Court decided *Obergefell*.

After the Supreme Court announced its decision in *Obergefell*, the Governor agreed with the *De Leon* plaintiffs that the federal-court injunction was "correct in light of *Obergefell*." *Id.* at 625. The Fifth Circuit thus affirmed the injunction and remanded the case with instructions that the district court enter a final judgment on the merits in the plaintiffs' favor. *Id.* The Governor did not oppose this disposition or seek the Supreme Court's review. On July 7, 2015, the district court entered a final judgment declaring that the Texas DOMAs violate the federal Constitution's due-process and equal-protection clauses and permanently enjoining the Governor "from enforcing Texas's laws prohibiting same-sex marriage." The parties agree that the State of Texas has been providing benefits to state employees' same-sex spouses ever since.

We agree with Pidgeon that *De Leon* does not bind the trial court in this case and the court of appeals should not have instructed the trial court to conduct further proceedings "consistent with" *De Leon*. *Penrod Drilling*, 868 S.W.2d at 296.[16] That does not mean, however, that the trial

---

[15] Rick Perry was the Texas Governor when *De Leon* was filed in 2013. By the time *Obergefell* issued in 2015, Greg Abbott was the Governor, having taken office in January of that year. Governor Abbott previously served as Texas Attorney General, and in that capacity, he represented Governor Perry in *De Leon*. When Abbott became Governor, Ken Paxton became Attorney General and began representing now-Governor Abbott in *De Leon*.

[16] *See also Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring) ("In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located."), *cited by Arizonans for Official English v. Arizona*, 520 U.S. 43, 58 n.11 (1997); *U. S. ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir. 1970) ("[B]ecause lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts."). Texas courts of appeals have also consistently recognized this principle. *See, e.g.*, *First Nat'l Collection Bureau, Inc. v. Walker*, 348 S.W.3d 329, 337 (Tex. App.—Dallas 2011, pet. denied) ("Although decisions of the federal courts of appeals do not bind Texas courts, [state courts] receive them 'with respectful consideration.'") (quoting *Hassan v. Greater Hous. Transp. Co.*, 237 S.W.3d 727, 731 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)); *Barstow v. State*, 742 S.W.2d 495, 501–02 (Tex. App.—Austin 1987, writ denied) ("We are not bound to follow [Fifth Circuit precedent] merely because Texas lies within the geographical limits of the Fifth Circuit.").

court should not consider *De Leon* when resolving Pidgeon's claims. Fifth Circuit decisions, particularly those regarding federal constitutional questions, can certainly be helpful and may be persuasive for Texas trial courts. Moreover, *De Leon* could potentially affect the relief the trial court might provide on remand, since *De Leon* has enjoined the Governor from enforcing the Texas DOMAs and the State of Texas is thus providing benefits to state employees' same-sex spouses. The trial court should certainly proceed on remand "in light of" *De Leon*, but it is not required to proceed "consistent with" it.

**B.  "Reversal" of the injunction**

Pidgeon next argues that by "reversing" the trial court's temporary injunction instead of vacating or dissolving it, the court of appeals' judgment might be taken to have a *res-judicata* effect prohibiting Pidgeon from seeking or obtaining the same or similar relief on remand. The Mayor contends, however, that the court of appeals could not have erred by reversing the injunction order because our rules only permit a court of appeals to "*reverse* the trial court's judgment and remand the case for further proceedings." TEX. R. APP. P. 43.2(d) (emphasis added); *compare* TEX. R. APP. P. 43.2(e) (permitting courts of appeals to "*vacate* the trial court's judgment and *dismiss* the case" (emphases added)) *with* 60.2(f) (permitting this Court to "*vacate* the lower court's judgment and *remand* the case for further proceedings in light of changes in the law" (emphases added)); *but see* TEX. R. APP. P. 43.6 ("The court of appeals may make any other appropriate order that the law and the nature of the case require.").

Texas appellate courts have held that the "dissolution of a temporary injunction bars a second application for such injunctive relief." *See Sonwalkar v. St. Luke's Sugar Land P'ship*, 394 S.W.3d 186, 195 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also City of San Antonio v.*

14

*Singleton*, 858 S.W.2d 411, 412 (Tex. 1993) (stating that the trial court's jurisdiction to "review, open, vacate or modify" an injunction based on changed conditions "must be balanced against principles of res judicata"). But that is not true if "the second request is based on changed circumstances not known by the applicant at the time of the first application." *Sonwalkar*, 394 S.W.3d at 195 (citing *State v. Ruiz Wholesale Co.*, 901 S.W.2d 772, 776 (Tex. App.—Austin 1995, no writ)). When conditions have changed, including a change in the law, the trial court may consider the injunction anew in light of the new law or circumstances. *See Smith v. O'Neill*, 813 S.W.2d 501, 502 (Tex. 1991) (per curiam) (citing *City of Tyler v. St. Louis Sw. Ry.*, 405 S.W.2d 330, 332 (Tex. 1966)); *Sonwalkar*, 394 S.W.3d at 195.

*Obergefell* undoubtedly constitutes a "change in the law" that justified the dissolution of the trial court's injunction in this case. But in light of that change in the law, Pidgeon is not precluded from seeking the same or similar relief on remand. On remand, the trial court must consider both parties' arguments regarding the effect of *Obergefell* on Pidgeon's claims, and may grant whatever relief is then appropriate.

## C. "Claw-back" Relief

Pidgeon next argues that the court of appeals should have affirmed the temporary injunction "to the extent" the injunction required the City to "claw back" tax dollars it expended on benefits for same-sex spouses prior to *Obergefell*. Pidgeon reasons that *Obergefell* does not apply retroactively to authorize pre-*Obergefell* expenditures because the Supreme Court acknowledged that it was attributing a new meaning to the Fourteenth Amendment based on "new insights and societal understandings." *Obergefell*, 135 S. Ct. at 2603. According to Pidgeon, Supreme Court decisions apply retroactively when the Court determines and enforces the

15

Constitution's *original* meaning, *see Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 106–07 (1993) (Scalia, J., concurring), but not when it changes the Constitution's meaning as it did in *Obergefell*.[17] And since *Obergefell* is not retroactive, the Texas DOMAs remained fully in effect at least until June 26, 2015, and the Mayor had no authority to issue or enforce the directive before then.

In response, the Mayor contends that Pidgeon lacks standing to seek any retroactive relief. The Mayor argues that although Pidgeon—as a City taxpayer—may have standing to complain about the City's future illegal expenditures of public funds, taxpayers only have standing to seek retrospective relief against illegal expenditures if they can demonstrate a particularized injury. *See Williams v. Lara*, 52 S.W.3d 171, 179 (Tex. 2001).

Relying on *Burwell v. Hobby Lobby Stores, Inc.*, — U.S. —, 134 S. Ct. 2751 (2014)—a challenge to federal health-insurance regulations under the federal Religious Freedom Restoration Act, *id.* at 2759—Pidgeon replies that he and Hicks have in fact suffered a particularized injury "because they are devout Christians who have been compelled by the mayor's unlawful edict to subsidize homosexual relationships that they regard as immoral and sinful." The Mayor, in turn, denies that *Hobby Lobby* grants Pidgeon standing under these circumstances, and contends that— even if Pidgeon had standing to seek retroactive monetary relief—he would not have standing to

---

[17] Pidgeon also argues that *Obergefell* cannot apply retroactively because otherwise (1) same-sex couples who lived together and held themselves out as "married" in jurisdictions that recognize common-law marriage would in fact be retroactively married; (2) any such couples who since ended their relationships and entered into new relationships could be retroactively liable for alimony to the former "spouses" and subject to bigamy prosecutions; and (3) jurisdictions around the country will be liable for damages to every same-sex couple that was denied a marriage license or recognition prior to *Obergefell*. We express no opinions on these hypotheticals at this time, as they are unnecessary to our resolution of this appeal.

force the City to recover funds it previously paid to third parties. *See Hoffman v. Davis*, 100 S.W.2d 94, 96 (Tex. 1937) (holding that when a taxing entity has already spent a taxpayer's tax money, "an action for its recovery is for the [taxing entity]," and the "cause of action belongs to it alone"); *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 556 (Tex. 2000) (quoting *Hoffman* with approval).

We find these arguments both interesting and important, but at least two obstacles prevent us from reaching them today. First, Pidgeon never requested an injunction requiring the City to claw back benefits it provided before *Obergefell*; and second, the trial court never granted one. The temporary injunction at issue here prospectively prohibited the City "from furnishing benefits to persons who were married in other jurisdictions to City employees of the same sex." The order did not to any extent require the City to recover benefits it had previously paid. It was a *temporary* injunction, and its only "proper function" was to "preserve the status quo." *Coyote Lake Ranch v. City of Lubbock*, 498 S.W.3d 53, 65 (Tex. 2016). We cannot conclude that the court of appeals erred by failing to preserve the injunction "to the extent" that it required a claw-back when it did not require a claw-back to any extent.

Because Pidgeon has never yet sought a claw-back injunction, we express no opinion on whether he has standing to seek one or whether he is entitled to one. We agree with Pidgeon, however, that the court of appeals' opinion and judgment do not prohibit him from seeking such an injunction or any other relief on remand. But we conclude that the court of appeals did not err by reversing this temporary injunction in its entirety.

17

**D.      Instructions on Remand**

Finally, Pidgeon urges us to instruct the trial court to "narrowly construe" *Obergefell* on remand and to "comply with *Obergefell* but not to expand on it," so as to "preserve as much of the [Texas DOMAs] as possible." Pidgeon argues that we should provide these instructions because *Obergefell* is "poorly reasoned," has "no basis in the text or history of the Constitution," and does not "faithfully interpret" the Constitution. So construed, *Obergefell* may have recognized a "fundamental right" to same-sex marriage and may "require States to license and recognize same-sex marriages," but, Pidgeon contends, it did not recognize a fundamental right "to spousal employee benefits" or "require States to give taxpayer subsidies to same-sex couples." Pidgeon argues that we should "remand for a new temporary injunction hearing" and the trial court should "consider on remand which applications of [the Texas DOMAs] can be preserved to the extent they prohibit taxpayer subsidies for same-sex marriages."

The Mayor agrees we should remand this case to the trial court, but contends that *Obergefell*, and *Windsor* before it, held that the Constitution protects not only the right of same-sex couples to marry, but also to receive all of the "benefits" of marriage. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2606 (declining to adopt a "slower, case-by-case determination of the required availability of specific public benefits to same-sex couples"); *Windsor*, 133 S. Ct. at 2694 (observing that the federal DOMA prevents "same-sex married couples from obtaining government healthcare benefits they would otherwise receive"). The Mayor also contends that Pidgeon lacks standing to challenge the Mayor's directive under *Obergefell*, and rejects Pidgeon's position that Texas courts can "narrowly construe" *Obergefell*, at least to the extent that means they can ignore its natural meaning and applications. *See, e.g.*, *McKinney v. Blankenship*, 282

18

S.W.2d 691, 694–95 (Tex. 1955) (rejecting argument that Texas courts could ignore *Brown v. Board of Education* since Texas's segregation laws "were not before the Supreme Court" in that case as "so utterly without merit that we overrule it without further discussion").

We agree with the Mayor that any effort to resolve whether and the extent to which the Constitution requires states or cities to provide tax-funded benefits to same-sex couples without considering *Obergefell* would simply be erroneous.[18] On the other hand, we agree with Pidgeon that the Supreme Court did not address and resolve that specific issue in *Obergefell*. "Whatever ramifications *Obergefell* may have for sexual relations beyond the approval of same-sex marriage are unstated at best . . . ." *Coker v. Whittington*, 858 F.3d 304, 307 (5th Cir. 2017).[19] The Supreme Court held in *Obergefell* that the Constitution requires states to license and recognize same-sex marriages to the same extent that they license and recognize opposite-sex marriages, but it did not hold that states must provide the same publicly funded benefits to all married persons, and—unlike the Fifth Circuit in *De Leon*—it did not hold that the Texas DOMAs are unconstitutional.

---

[18] *See, e.g.*, *Pavan v. Smith*, ___ U.S.___, 2017 WL 2722472, at *2 (2017) (per curiam) (holding that "*Obergefell* proscribes" the "disparate treatment" resulting from state statute that requires listing married woman's husband's name on child's birth certificate but permits state to omit married woman's female spouse's name); *see also Obergefell*, 135 S. Ct. at 2601 (stating that "same-sex couples are denied the constellation of benefits that the States have linked to marriage"), 2604 (stating that DOMAs "burden the liberty of same-sex couples" and deny "all the benefits afforded opposite-sex couples"), 2626 (Roberts, C.J., dissenting) (inviting same-sex-marriage proponents to celebrate "the availability of new benefits"); *Windsor*, 133 S. Ct. at 2692 (stating that the federal "DOMA rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State"), 2693 (stating that the federal DOMA "operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages").

[19] *See, e.g.*, *Parella v. Johnson*, No. 1:15-cv-0863, 2016 WL 3566861, at *9–10 (N.D.N.Y. June 27, 2016) (holding that even after *Obergefell*, the "fundamental right to marry" does not include "the right to obtain a visa for an alien spouse"); *Solomon v. Guidry*, 155 A.3d 1218, 1221 (Vt. 2016) ("[B]ecause civil marriage and civil unions remain legally distinct entities in Vermont and because *Obergefell* mandated that states recognize only same-sex *marriage*, uncertainty remains as to whether *Obergefell* requires other states to recognize and dissolve civil unions established in Vermont."); *In re P.L.L.-R.*, 876 N.W.2d 147, 153 (Wis. Ct. App. 2015) ("*Obergefell* did not answer questions regarding Wisconsin's presumption of paternity statute.").

Of course, that does not mean that the Texas DOMAs *are* constitutional or that the City may constitutionally deny benefits to its employees' same-sex spouses. Those are the issues that this case now presents in light of *Obergefell.* We need not instruct to the trial court to "narrowly construe" *Obergefell* to confirm that *Obergefell* did not directly and expressly resolve those issues. But neither will we instruct the trial court to construe *Obergefell* in any manner that makes it irrelevant to these issues. Pidgeon contends that neither the Constitution nor *Obergefell* requires citizens to support same-sex marriages with their tax dollars, but he has not yet had the opportunity to make his case. And the Mayor has not yet had the opportunity to oppose it. Both are entitled to a full and fair opportunity to litigate their positions on remand.

Although both parties agree that we should remand this case for the parties to have that full and fair opportunity, some amici have argued that we should resolve the parties' dispute here on this interlocutory appeal. We cannot resolve the parties' claims now, however, because they have not yet been fully developed or litigated. The parties' arguments address the meaning and ramifications of *Obergefell*, which was not announced until after the parties had filed their briefs in the court of appeals. Naturally, the parties did not raise their current arguments in the trial court or in the court of appeals, and neither court ruled on them. Many of the arguments—including those addressing standing and retroactivity, for example—depend on an evidentiary record that the parties have not yet had the opportunity to develop. "Without an actual challenge . . . , without full briefing from all parties . . . , and without complete vetting of the parties' potential arguments in the lower courts, we are ill-prepared to offer—and constitutionally prohibited from offering—an advisory interpretation . . . that could have significant, lasting consequences." *Hegar v. Tex. Small Tobacco Coal.*, 496 S.W.3d 778, 792 (Tex. 2016) (citing *Brooks v. Northglen Ass'n*, 141 S.W.3d

20

158, 164 (Tex. 2004)); *see also Pub. Affairs Assocs. v. Rickover*, 369 U.S. 111, 113 (1962) ("These are delicate problems; their solution is bound to have far-reaching import. Adjudication of such problems, certainly . . . should rest on an adequate and full-bodied record. The record before us is woefully lacking in these requirements."). We decline the amici's requests that we render a final ruling on the merits before the parties have had a full opportunity to make their case.

## IV.
### Immunity

Finally, we address the Mayor's and the City's interlocutory appeals from the trial court's orders denying their pleas to the jurisdiction based on governmental immunity. Although the parties briefed this issue in the court of appeals, they did so before *Obergefell*, and the court did not address the issue in its opinion or its judgment. The Mayor noted the issue but reserved briefing in this Court. We are hesitant to ignore the issue because governmental immunity implicates the courts' subject-matter jurisdiction to hear Pidgeon's claims. *See Engelman Irrig. Dist. v. Shield Bros.*, — S.W.3d —, — (Tex. 2017). But neither party has briefed the issue since *Obergefell*, which may also affect the immunity defenses.

The parties agree, for example, that Pidgeon sued the Mayor in her official capacity for acting *ultra vires*, that is, "without legal authority." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (2009). Pidgeon alleges that the Mayor acted unlawfully and without authority by issuing and enforcing the directive because the Texas and Houston DOMAs prohibit the City from providing benefits to employees' same-sex spouses. Governmental immunity does not bar an *ultra-vires* claim, but the parties disagree whether the Mayor's directive remains unlawful and unauthorized

21

after *Obergefell*.[20] This disagreement may present the ultimate issue in this case, both on the merits and for purposes of determining whether the Mayor has acted *ultra vires*.

The trial court denied the Mayor's plea, but it did so in 2014, prior to *Obergefell*. Whether (or the extent to which) Pidgeon alleges *ultra-vires* conduct even after *Obergefell* is an issue that the trial court must address in the first instance. *See* TEX. R. APP. P. 60.2(f) (providing that this Court may "vacate the lower court's judgment and remand the case for further proceedings in light of changes in the law"); *In re Doe 2*, 19 S.W.3d 278, 283 (Tex. 2000) (noting that rule 60.2(f) is "particularly well-suited" to situations in which courts must address novel situations).

Unlike the Mayor, however, the City is not a proper party to an *ultra-vires* claim. *See Heinrich*, 284 S.W.3d at 372–73 ("[T]he governmental entities themselves—as opposed to their officers in their official capacity—remain immune from suit. . . . [I]t follows that [*ultra-vires*] suits cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity."). The City argued in its plea that the trial court must dismiss Pidgeon's claims against it because Pidgeon failed to plead or establish any waiver of the City's immunity. In response, Pidgeon argued that the Texas Uniform Declaratory Judgments Act (the DJA) waives the City's immunity against Pidgeon's claim. *See* TEX. CIV. PRAC. & REM. CODE §§ 37.001–.011.

---

[20] We note that neither the Supreme Court in *Obergefell* nor the Fifth Circuit in *De Leon* "struck down" any Texas law. When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it. Thus, the Texas and Houston DOMAs remain in place as they were before *Obergefell* and *De Leon*, which is why Pidgeon is able to bring this claim.

22

The City pointed out, however, that Pidgeon never mentioned the DJA in his petition, much less pleaded that it waived the City's governmental immunity. At the hearing on the City's plea, and in his brief in the court of appeals, Pidgeon acknowledged that he had not expressly pleaded a claim or waiver under the DJA, but offered to amend his pleadings "to make the request for a declaration more explicit." On remand, Pidgeon will have the opportunity to replead his claims against the City, and the City will have the opportunity to file a new plea to the jurisdiction as to any such claims.

## V.
## Conclusion

In *Obergefell*, the Supreme Court acknowledged that our historical view of marriage has long been "based on the understanding that marriage is a union between two persons of the opposite sex." 135 S. Ct. at 2594. It concluded, however, that this "history is the beginning of these cases," and it rejected the idea that it "should be the end as well." *Id.* But *Obergefell* is not the end either. Already, the Supreme Court has taken one opportunity to address *Obergefell*'s impact on an issue it did not address in *Obergefell*, and there will undoubtedly be others. *See Pavan*, ___ U.S. at ___, 2017 WL 2722472, at *2.[21] Pidgeon and the Mayor, like many other litigants throughout the country, must now assist the courts in fully exploring *Obergefell*'s reach and ramifications, and are entitled to the opportunity to do so.

---

[21] On the same day the Supreme Court issued its per curiam opinion in *Pavan*, it also granted certiorari in another case involving a same-sex-marriage issue *Obergefell* did not address. *See Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015), *cert. granted sub nom. Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, — U.S.L.W. — (U.S. June 26, 2017) (No. 16-111). The Court's decision to hear and consider *Masterpiece Cakeshop* illustrates that neither *Obergefell* nor *Pavan* provides the final word on the tangential questions *Obergefell*'s holdings raise but *Obergefell* itself did not address.

Today, however, we are dealing only with an interlocutory appeal from a trial court's orders denying a plea to the jurisdiction and granting a temporary injunction. For the reasons explained, we hold that the Fifth Circuit's decision in *De Leon* does not bind the trial court on remand, and the trial court is not required to conduct its proceedings "consistent with" that case. We hold that the court of appeals' judgment does not bar Pidgeon from seeking all appropriate relief on remand or bar the Mayor from opposing that relief. We hold that the court of appeals did not err by failing to affirm the temporary injunction "to the extent" it required the City to claw back payments made prior to *Obergefell*. And we decline to instruct the trial court how to construe *Obergefell* on remand. We reverse the court of appeals' judgment, vacate the trial court's temporary injunction order, and remand this case to the trial court for further proceedings consistent with our judgment and this opinion.

 

_____
Jeffrey S. Boyd
Justice

Opinion delivered:  June 30, 2017