ACCEPTED
15-25-00207-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/21/2025 4:39 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00207-CV

In the

## Fifteenth Court of Appeals

RECEIVED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/21/2025 4:39:23 PM
CHRISTOPHER A. PRINE
Clerk

IN RE NOVARTIS PHARMACEUTICALS CORPORATION,

*Relator.*

Original Proceeding from the 71st Judicial District Court in Harrison County, Texas

Trial Court Cause No. 23-0276

The Honorable Brad Morin Presiding

## BRIEF OF *AMICUS CURIAE* U.S. CHAMBER OF COMMERCE IN SUPPORT OF PETITIONER

LINDSEY COHAN
DECHERT LLP
515 Congress Ave.
Suite 1400
Austin, TX 78701

STEVEN A. ENGEL
(*Pro Hac Vice* Application Pending)
MICHAEL H. MCGINLEY
(*Pro Hac Vice* Application Pending)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

November 21, 2025

i

# IDENTITY OF PARTIES, *AMICUS CURIAE*, AND COUNSEL

The parties and their counsel are identified in the Petition for Writ of Mandamus. This *amicus curiae* brief is written on behalf of *Amicus Curiae* the Chamber of Commerce of the United States of America ("Chamber"). The Chamber is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The Chamber is represented by the following counsel:

Lindsey Cohan
DECHERT LLP
515 Congress Ave.
Suite 1400
Austin, TX 78701

Steven A. Engel
  (*Pro Hac Vice* Application Pending)
Michael H. McGinley
  (*Pro Hac Vice* Application Pending)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION ..................................................................................... 3

ARGUMENT ............................................................................................ 6

   I.    The Separation of Powers Is Fundamental to Both the Texas and United States Constitutions. ....................................................... 6

      A.    The Texas Constitution Makes Clear that the Separation of Powers Safeguards Liberty. ...................................................... 6

      B.    The Separation of Powers Under the Texas Constitution Derives from the U.S. Constitution. ............................................ 9

      C.    Courts Have Long Recognized that the U.S. Constitution's Separation of Powers Vests All Executive Power in a Politically Accountable Executive. ............................................................ 12

   II.   The Texas Constitution Vests the Attorney General and County Attorneys with the Authority of the State. ................................ 14

   III.   The TMFPA's Qui Tam Provisions Violate the Texas Constitution. ............................................................................... 17

      A.    The TMFPA Violates the Separation-of-Powers Principles Enshrined in Article II, Section 1; Article IV, Section 22; and Article V, Section 21. ............................................................. 17

      B.    Federal Caselaw Reinforces the Conclusion that the TMFPA Is Unconstitutional. ..................................................................... 19

      C.    History Cannot Salvage the Texas Qui Tam Provisions' Affront to the Separation of Powers. ................................................... 23

PRAYER ................................................................................................ 29

CERTIFICATE OF SERVICE ................................................................ 1

CERTIFICATE OF COMPLIANCE ....................................................... 2

i

**Page(s)**

**CASES**

*Albertson's, Inc. v. Sinclair,*
  984 S.W.2d 958 (Tex. 1999) ...............................................................16

*Allen v. Fisher,*
  9 S.W.2d 731 (Tex. 1928) ...................................................................15

*Armadillo Bail Bonds v. State,*
  802 S.W.2d 237 (Tex. Crim. App. 1990) (en banc) ..........................7, 8

*Chisholm v. Bewley Mills,*
  287 S.W.2d 943 (Tex. 1956) ...............................................................16

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
  587 U.S. 262 (2019) .............................................................................21

*Dao v. Trinh,*
  2024 WL 2069933 (Tex. Ct. App. May 9, 2024) .................................18

*Dep't of Transp. v. Ass'n of Am. R.R.,*
  575 U.S. 43 (2015) ........................................................................12, 13

*El Paso Elec. Co. v. Tex. Dep't of Ins.,*
  937 S.W.2d 432 (Tex. 1996) ..........................................................17, 19

*Ex parte Davis,*
  957 S.W.2d 9 (Tex. Crim. App. 1997) (en banc) ...............................20

*Fin. Comm'n of Texas v. Norwood,*
  418 S.W.3d 566 (Tex. 2013) .................................................................3

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ......................................................................12, 13

*Garcia v. City of Willis,*
  593 S.W.3d 201 (Tex. 2019) .................................................................7

*Image API, LLC v. Young,*
691 S.W.3d 831 (Tex. 2024) ...................................................................... 16

*In re Abbott,*
628 S.W.3d 288 (Tex. 2021) ...................................................................... 20

*In re Allcat Claims Serv., L.P.,*
356 S.W.3d 455 (Tex. 2011) .............................................................. 14, 16

*In re Dallas Cnty.,*
697 S.W.3d 142 (Tex. 2024) ...................................................................... 28

*In re Novartis Pharms. Corp.,*
___ S.W.3d ___, 2025 WL 2989490 (Tex. 2025) ........................ 6, 18, 23

*Johnson ex rel. MAII Holdings, Inc. v. Jackson Walker, L.L.P.,*
247 S.W.3d 765 (Tex. Ct. App. 2008) ........................................................ 7

*Jones v. State,*
803 S.W.2d 712 (Tex. Crim. App. 1992) (en banc) ............................... 8

*Kinney v. Barnes,*
443 S.W.3d 87 (Tex. 2014) ................................................................. 5, 20

*Lucia v. Sec. Exch. Comm'n,*
585 U.S. 237 (2018) .................................................................................. 28

*Marsh v. Chambers,*
463 U.S. 783 (1983) .................................................................................. 28

*Martin v. Hunter's Lessee,*
14 U.S. (1 Wheat.) 304 (1816) ................................................................. 13

*Michaelis v. Rollins,*
1999 WL 33748054 (Tex. App. May 6, 1999) ....................................... 16

*Mosley v. Texas Health & Hum. Servs. Comm'n,*
593 S.W.3d 250 (Tex. 2019) ...................................................................... 20

*Murphy v. Smith,*
583 U.S. 220 (2018) .................................................................................. 16

*N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022)................................................................27

*Pidgeon v. Turner,*
  538 S.W.3d 73 (Tex. 2017) ............................................5, 20

*Robertson v. United States ex rel. Watson,*
  560 U.S. 272 (2010) ............................................................11

*Satterfield v. Crown Cork & Seal Co.,*
  268 S.W.3d 190 (Tex. Ct. App. 2008)................................21

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020) ......................................................12, 21

*State ex rel. Downs v. Harney,*
  164 S.W.2d 55 (Tex. Civ. App. 1942)................................17

*State ex rel. Durden v. Shahan,*
  658 S.W.3d 300 (Tex. 2022) (per curiam) ........................15

*State ex rel. Hill v. Pirtle,*
  887 S.W.2d 921 (Tex. Crim. App. 1994) ...........................16

*State v. Rhine,*
  297 S.W.3d 301 (Tex. Crim. App. 2009) ...........................14

*State v. Stephens,*
  663 S.W.3d 45 (Tex. Crim. App. 2021) .......................14, 15

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,*
  852 S.W.2d 440 (Tex. 1993) ..............................................18

*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,*
  952 S.W.2d 454 (Tex. 1997) ................................................8

*Tex. Dep't of Transp. v. T. Brown Constructors, Inc.,*
  947 S.W.2d 655 (Tex. Ct. App. 1997)..................................6

*United States ex rel. Gentry v. Encompass Health Rehab.
  Hosp. of Pearland, L.L.C.,*
  ___ F.4th ___, 2025 WL 3063921 (5th Cir. 2025) ..............5

*United States ex rel. Atkins v. McInteer,*
    470 F.3d 1350 (11th Cir. 2006) ...................................... 24

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.,*
    133 F.4th 395 (5th Cir. 2025) ....................................... 5

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
    599 U.S. 419 (2023) (Thomas, J., dissenting) .................... 4, 13, 22, 23

*United States ex rel. Zafirov v. Florida Medical Associates, LLC,*
    751 F. Supp. 3d 1293 (M.D. Fla. 2024) ..................... 5, 22, 28

*United States v. Rahimi,*
    602 U.S. 680 (2024) ................................................ 27

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ................................................ 25

*Waffle House, Inc. v. Williams,*
    313 S.W.3d 796 (Tex. 2010) ...................................... 20

*Walz v. Tax Comm'n of City of New York,*
    397 U.S. 664 (1970) ................................................ 28

*Wis. Bell, Inc. v. United States ex rel. Heath,*
    145 S. Ct. 498 (2025) .............................................. 22

## CONSTITUTIONS

Tex. Const. art. II, § 1 .......................................... 3, 6, 7, 14, 19

Tex. Const. art. XVII .............................................. 19

Texas Rule of Appellate Procedure 9.4(i) ......................... 2

U.S. Const. art. II, § 1, cl. 1 ..................................... 12, 13, 22

U.S. Const. art. II, § 2, cl. 2 ..................................... 22

## STATUTES

Tex. Hum. Res. Code § 36.101(a) ................................. 17

Tex. Hum. Res. Code § 36.101(b) ........................................... 18

Tex. Hum. Res. Code § 36.104(b) ..................................... 17, 18

Tex. Hum. Res. Code § 36.110(a-1) ...................................... 18

**Other Authorities**

1 *Annals of Cong.* 480 (1789) (statement of James Madison) ............... 13

3 Sir Edward Coke, *Institutes of the Laws of England* 194
 (4th ed. 1797) ................................................................. 27

4 William Blackstone, *Commentaries on the Laws of
 England* (1769) ........................................................ 9, 10, 11

4 William S. Holdworth, *A History of English Law* (1923) ............. 26, 27

5 Matthew Bacon, *A New Abridgement of the Law* 798 (7th
 ed. 1832) ....................................................................... 11

2007 Tex. Sess. Law Serv. Ch. 29, § 4 (S.B. 362) .................................. 17

A. Scalia & B. Garner, *Reading Law: The Interpretation of
 Legal Texts* 114 (2012) ....................................................... 16

Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177 .................. 24

Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195–96 ....................... 25

Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131 .................................. 25

Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48 ............... 24

Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 ............................ 25

Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 .................................... 24

Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67 ..................................... 24

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing
 Doctrine?*,
 102 Mich. L. Rev. 689 (2004) ............................................. 26

Baron de Montesquieu, *The Spirit of the Laws* 157 (A. Cohler, B. Miller, & H. Stone eds. 1989) ................................. 9

*Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989) ........................................ 25, 26, 27

John Locke, *Two Treatises on Civil Government* 197 (George Routledge & Sons ed., 1884) ................................................. 9

Pamela Bucy et al., *States, Statutes, and Fraud: A Study of Emerging State Efforts to Combat White Collar Crime*, 31 Cardozo L. Rev. 1523, 1542–43 (2010) .......................................... 23

## INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and state and federal courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the business community.

The federal False Claims Act ("FCA") and parallel state laws, such as the Texas Medicaid Fraud Prevention Act ("TMFPA"), together affect nearly every sector of the economy, from healthcare, defense, and construction, to technology, education, and banking. These acts no doubt promote the worthy goal of protecting the federal and state treasuries

---

[1] *Amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

from fraud. But the Chamber believes that the *qui tam* mechanisms in such statutes have been grossly abused, particularly over the past few decades, during which relators have sought to exploit the extraordinary powers granted by such mechanisms to seek private profit in cases that do not involve genuine fraud against the federal and state governments.

The unusual *qui tam* device deputizes individual relators to exercise government power and pursue litigation on behalf of the sovereign, even when the government refuses to intervene. And that transfer of core government power to private hands has exacted a substantial economic toll. Companies frequently spend millions of dollars conducting investigations, fielding discovery demands, and engaging in motions practice—all to defend against baseless allegations that the government has deemed unworthy of prosecution. Those litigation costs quickly add up. As a result, even meritless cases can be used to extract enormous settlements.

Because *qui tam* provisions impose costs that affect businesses across the Nation, the Chamber has a significant interest in this case.

The Chamber files this *amicus curiae* brief to assist the Court and explain why the TMFPA violates the Texas Constitution.[2]

## **INTRODUCTION**

In 2007, Texas amended the TMFPA to include *qui tam* provisions. Those added provisions violate the separation of powers under the Texas Constitution. That foundational document guarantees that "[t]he powers of the Government of the State of Texas shall be divided into three distinct departments"—Legislative, Executive, and Judicial—and that "no person, or collection of persons, being one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Tex. Const. art. II, § 1.

The Texans who ratified the State's Constitution understood that "[t]he principle of separation of powers is foundational for federal and state governments in this country and firmly embedded in our nation's history." *Fin. Comm'n of Texas v. Norwood*, 418 S.W.3d 566, 570 (Tex. 2013). That is so because a government of separated powers ensures that no single institution attains political dominance over the State, and that

---

[2] The Chamber agrees with Novartis's argument that the relator lacks constitutional standing, but files this brief to address the separation-of-powers problems underlying the TMFPA.

3

politically accountable government officials bear responsibility for the enforcement of the State's law—including the TMFPA. Thus, maintaining the separation of powers is critically important to protecting the liberties of the People from governmental overreach.

The *qui tam* provisions of the TMFPA violate these core constitutional requirements. Through those provisions, the State legislature has wrested the enforcement power from the hands of the government attorneys—to whom it is assigned by the Texas Constitution—and bestowed it upon unaccountable private plaintiffs who are free to pursue claims that state officials have declined to chase. Such a transfer of power is unconstitutional.

The separation-of-powers principles embodied in the Texas Constitution reflect those in the federal Constitution. And, recently, three Justices of the U.S. Supreme Court observed that "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II" of the U.S. Constitution. *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting); *see id.* at 442 (Kavanaugh, J., joined by Barrett, J., concurring). A federal district judge has since thoroughly considered those concerns in holding

4

that the *qui tam* provisions of the FCA—which the TMFPA tracks— violate the federal Constitution. *See United States ex rel. Zafirov v. Florida Medical Associates, LLC*, 751 F. Supp. 3d 1293, 1300 (M.D. Fla. 2024), *appeal pending*, No. 24-13581 (11th Cir. argument scheduled for Dec. 12, 2025). Just this year, two judges on the U.S. Court of Appeals for the Fifth Circuit have agreed. *See United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, ___ F.4th ___, 2025 WL 3063921, at *5 (5th Cir. 2025) (Ho, J., concurring); *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 411 (5th Cir. 2025) (Duncan, J., concurring).

The TMFPA's *qui tam* provisions are likewise invalid under the Texas Constitution. Indeed, the Texas Constitution even more explicitly safeguards the separation of powers to ensure official accountability and protect liberty. *See, e.g.*, *Kinney v. Barnes*, 443 S.W.3d 87, 92 (Tex. 2014); *Pidgeon v. Turner*, 538 S.W.3d 73, 83 (Tex. 2017). Just as the FCA's *qui tam* provisions contravene the separation-of-powers principles underpinning the federal Constitution, the TMFPA's *qui tam* provisions run roughshod over those expressly protected by the Texas Constitution. The *qui tam* provisions give self-appointed private citizens substantial

5

governmental power to enforce public rights that only Texas government attorneys are authorized to enforce.

Two Justices of the Texas Supreme Court have recognized that the "weighty issues" underlying the "constitutional concerns surrounding qui tam litigation" are worthy of detailed consideration by this Court in advance of their "eventual and inevitable consideration" by the high court. *See In re Novartis Pharms. Corp.*, ___ S.W.3d ___, 2025 WL 2989490, at *1 (Tex. 2025) (statement of Young, J., joined by Sullivan, J.). This Court should hold the TMFPA's *qui tam* provisions unconstitutional and issue a writ of mandamus directing the dismissal of HSG's claims.

## ARGUMENT

**I.    The Separation of Powers Is Fundamental to Both the Texas and United States Constitutions.**

**A.    The Texas Constitution Makes Clear that the Separation of Powers Safeguards Liberty.**

Like the federal Constitution, the Texas Constitution "expressly preserves three distinct departments of government." *Tex. Dep't of Transp. v. T. Brown Constructors, Inc.*, 947 S.W.2d 655, 659 (Tex. Ct. App. 1997). But the Texas Constitution's ratifiers went even further and adopted Article II, § 1 to *explicitly* ensconce the inviolability of the

6

separation of powers into the State's foundational document. The Article first mandates that "the Government of the State of Texas shall be divided into three distinct departments"—the "Legislative," "Executive," and "Judicial." Tex. Const. art. II, § 1; *see, e.g.*, *Johnson ex rel. MAII Holdings, Inc. v. Jackson Walker, L.L.P.*, 247 S.W.3d 765, 777 (Tex. Ct. App. 2008). The Article then makes plain what is implied in the federal Constitution—that "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Tex. Const. art. II, § 1. This separation of powers "reflects a belief on the part of those who drafted and adopted [Texas's] [C]onstitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990) (en banc). And due regard for this separation of powers mandates that "governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution." *Garcia v. City of Willis*, 593 S.W.3d 201, 206 (Tex. 2019) (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)).

One branch can violate the separation-of-powers principles embodied in Article II, § 1 without directly arrogating to itself the powers of another branch. *See Armadillo Bail Bonds*, 802 S.W.2d at 239. It can do so by "unduly interfer[ing] with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers." *Id.* (emphasis omitted); *see Jones v. State*, 803 S.W.2d 712, 715 (Tex. Crim. App. 1992) (en banc). Thus, the Texas legislature might unduly interfere with another branch's authority by delegating that branch's powers to a private entity via statute. *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 465–75 (Tex. 1997) (holding that "improperly delegating government authority to" a private foundation violated the separation of powers in part because it did not delegate executive functions to an "administrative" agency). Such a move would not merely offend the separation of powers. "More fundamentally, the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the People, appointed by a public official or entity, nor employed by the government" to exercise a power assigned to one of the branches. *Id.* at 469.

**B. The Separation of Powers Under the Texas Constitution Derives from the U.S. Constitution.**

The State of Texas derived its understanding of separated powers from the U.S. Constitution, including its conception of the executive power. Just as the authors of the Texas Constitution drew on, and elaborated upon, the concept of executive power embodied in the U.S. Constitution, the Texas Founders drew on, and elaborated upon, the U.S. Founders' understanding of separated powers, which vested the executive power in accountable government officers. Thus, to understand the nature of the Texas executive power, it is necessary to understand its origin in the Anglo-American legal tradition.

The conception of centralized executive authority under the U.S. Constitution finds roots in the influential political theory of John Locke. As he explained, "in the state of Nature[,] every one has the executive power of the law of Nature." John Locke, *Two Treatises on Civil Government* 197 (George Routledge & Sons ed., 1884); *see also* Baron de Montesquieu, *The Spirit of the Laws* 157 (A. Cohler, B. Miller, & H. Stone eds. 1989). But "when they enter into society," individuals "give up the . . . executive power they had in the state of Nature into the hands of the society." Locke, *supra,* at 258. That is, the people delegate their

9

executive authority to public officials, whose power is "to be directed to no other end but the peace, safety, and public good of the people." *Id.* at 259.

William Blackstone's Commentaries reflect a similar understanding. "In a state of society," he reasoned, the right "to put [the law] in execution" is "transferred from individuals to the sovereign power," who "alone . . . bears the sword of justice by the consent of the whole community." 4 William Blackstone, *Commentaries on the Laws of England* 7–8 (1769). And because the public "delegate[s] all its power and rights, with regard to the execution of the laws, to one visible magistrate," that officer is "the proper person to prosecute for all public offences." 1 Blackstone, *Commentaries* at 268.

Importantly, this understanding of the executive power was not strictly limited to the prosecution of "criminal" offenses. Rather, it extended to the pursuit of relief for all "infraction[s] of the public rights belonging to th[e] community." 4 Blackstone, *Commentaries* at 2. Vindicating those public rights is the prerogative of the sovereign actor whom the people have empowered to administer the laws. *See id.*

10

Of course, the common law recognized that if a person has personally "suffered the damage" from a public infraction, then he might have a concomitant right to demand redress "in his own name." Locke, *supra*, at 196. But that would not permit him to pursue relief on behalf of the public writ large. "[N]o person" other than the official entrusted with the executive authority "can have an action for a public nuisance, or punish it," unless that "private person suffers some extraordinary damage." 3 Blackstone, *Commentaries* at 219–20. Because individual persons give up the right to exercise executive authority when they enter society, "the law gives no *private* remedy for any thing but a *private* wrong." *Id.* at 219; *see also* 5 Matthew Bacon, *A New Abridgement of the Law* 798 (7th ed. 1832) (explaining that "common nuisances against the public are only punishable by a public prosecution").

In short, the Framers understood that "[a] basic step in organizing a civilized society" was to take the "sword" of law-enforcement actions "out of private hands and turn it over to an organized government, acting on behalf of all the people." *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 282–83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari as improvidently granted). That is, only the public

11

office or entity vested with the executive power could vindicate public rights.

### C. Courts Have Long Recognized that the U.S. Constitution's Separation of Powers Vests All Executive Power in a Politically Accountable Executive.

The Framers of the U.S. Constitution enshrined this understanding in Article II's text, which vests "[t]he executive Power" in a single "President of the United States." U.S. Const. art. II, § 1, cl. 1. The Framers adopted that unitary structure to ensure that "a President chosen by the entire Nation" would "oversee the execution of the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010). And they entrusted "the President alone" with "all of" the Nation's executive Power in order to ensure that he would remain accountable for all those who would act on his behalf. *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 213 (2020); *see Free Enter. Fund*, 561 U.S. at 495–96.

Consistent with this need for accountability, the Framers did not vest "[p]rivate entities . . . with the 'executive Power.'" *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting U.S. Const. art. II, § 1, cl. 1). "[T]he intention of the Constitution" was

12

instead "that the first Magistrate should be responsible for the executive department" in its entirety. 1 *Annals of Cong.* 480 (1789) (statement of James Madison). To that end, the federal Constitution established a unitary and accountable Executive who alone was charged with the responsibility for enforcing federal law. *See Free Enter. Fund*, 561 U.S. at 496–97; *Ass'n of Am. R.R.*, 575 U.S. at 67–68 (Thomas, J., concurring in the judgment).

More to the point, the Framers understood that the branch entrusted with the legislative power—Congress—could not strip the President of the executive power that the Constitution vested in that office. After all, the Constitution created "a separate Executive Branch *coequal* to the Legislature," *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting) (emphasis added), in which *only* the President "shall be vested" with the executive power, U.S. Const. art. II, § 1, cl. 1. Given that design, it is "utterly inadmissible" for Congress to attempt to vest executive authority "in any other person" besides the President. *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 330 (1816) (Story, J.); *see also Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring) (questioning the

13

propriety of "citizen suits" that might delegate "the 'Executive power'" (citation omitted)).

## II. The Texas Constitution Vests the Attorney General and County Attorneys with the Authority of the State.

By dividing its government into three parts, the Texas Constitution adopts the model set by the U.S. Constitution. If anything, that model is "more aggressively enforce[d]" in Texas because, unlike the federal Constitution, the Texas Constitution contains an "express separation of powers provision" in Article II, Section 1. *State v. Stephens*, 663 S.W.3d 45, 49–50 (Tex. Crim. App. 2021); *see State v. Rhine*, 297 S.W.3d 301, 315 (Tex. Crim. App. 2009) (Keller, P.J., concurring). That "explicit Separation of Powers provision—something the U.S. Constitution lacks—prohibits not just the *exercise* of one branch's powers by another branch, but also any *interference* with another branch's exercise of its own authority." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 485–86 (Tex. 2011) (Willett, J., concurring in part) (footnote omitted).

Although the Texas Constitution does not have a unitary executive like the federal government, it expressly specifies the politically accountable officials who may exercise the executive power of the State. Article IV, Section 22 provides that the Attorney General "shall represent

14

the State in all suits and pleas in the Supreme Court of the State . . . and perform such other duties as may be required by law." Similarly, Article V, Section 21 provides that county attorneys "shall represent the State in all cases in the District and inferior courts in their respective counties." Read together, these provisions confirm that the "Texas Constitution authorizes the attorney general, county attorneys, and district attorneys to represent the state in various cases." *State ex rel. Durden v. Shahan*, 658 S.W.3d 300, 303 (Tex. 2022) (per curiam).

Article IV, Section 22 and Article V, Section 21 thus "mark the limits of legislative authority to prescribe who shall represent the state and control its interests in a lawsuit in the district court." *Allen v. Fisher*, 9 S.W.2d 731, 732 (Tex. 1928). That is so even though Texas categorizes the Attorney General as an executive officer and the county attorneys as judicial officers. *See Stephens*, 663 S.W.3d at 54. What matters is that the authors of the Texas Constitution entrusted specific state officers with the fundamentally executive power to enforce the State's laws. But the authors nowhere authorized the legislature to transfer that power to private citizens via a private right of action to vindicate public rights. *See*

15

*State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 928 (Tex. Crim. App. 1994); *Michaelis v. Rollins*, 1999 WL 33748054, at *1 (Tex. App. May 6, 1999).

Indeed, the text is unmistakably clear: the Texas Constitution uses the word "shall." This Court must "presume the language of the Constitution was carefully selected, interpret words as they are generally understood, and rely heavily on the literal text." *In re Allcat*, 356 S.W.3d at 466. And "the word 'shall' is generally construed to be mandatory." *Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956); *see also, e.g.*, *Image API, LLC v. Young*, 691 S.W.3d 831, 841 (Tex. 2024) ("[U]sing words like shall or must, is mandatory."); *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999) ("We generally construe the word 'shall' as mandatory, unless legislative intent suggests otherwise."); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012) ("[W]hen the word shall can reasonably be read as mandatory, it ought to be so read"); *Murphy v. Smith*, 583 U.S. 220, 223 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty.").

As a result, the "shall" language of Article IV, Section 22 and Article V, Section 21 makes clear that the Texas Constitution "vests in the county attorney and" the attorney general alone the authority to enforce

16

Texas law in the State's courts. *State ex rel. Downs v. Harney*, 164 S.W.2d 55, 58 (Tex. Civ. App. 1942). That unequivocal language means that the Texas legislature cannot "divest these officials of their collective constitutional authority by shifting representation to some other attorney." *El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 439 (Tex. 1996).

## III. The TMFPA's *Qui Tam* Provisions Violate the Texas Constitution.

### A. The TMFPA Violates the Separation-of-Powers Principles Enshrined in Article II, Section 1; Article IV, Section 22; and Article V, Section 21.

The TMFPA provides that a "person may bring a civil action for a violation" of the Act "for the person *and for the state*," which "shall be brought in the name of the person and of the state." Tex. Hum. Res. Code § 36.101(a) (emphasis added). For the first decade after its enactment, the TMFPA provided that the court "shall dismiss the action" if the State declined to bring it. *Id.* § 36.104(b) (2005). But the Texas Legislature amended the statute in 2007 to allow private individuals to continue litigation without the State's consent. *See* 2007 Tex. Sess. Law Serv. Ch. 29, § 4 (S.B. 362). Now, if the State declines to take over the action, "the person bringing the action may proceed without the state's

17

participation." Tex. Hum. Res. Code § 36.104(b). If a private person succeeds in her *qui tam* action, the defendant must pay the same civil penalties as if the State had brought the action itself. *See id.* § 36.101(b). And the private person receives a significant bounty from that penalty award. *See id.* § 36.110(a-1). In other words, the TMFPA authorizes (indeed, incentivizes) private individuals to sue on behalf of the State in circumstances where the State attorneys specifically empowered by Section 21 and Section 22 affirmatively decline to press the litigation. *See Novartis Pharms.*, ___ S.W.3d ___, 2025 WL 2989490, at *2 (statement of Young, J., joined by Sullivan, J.).

By authorizing a private person to "proceed without the state's participation," Tex. Hum. Res. Code § 36.104(b), the Texas legislature unconstitutionally devolved the State's power to individuals who lack the constitutional authority to exercise it. Again, that is because the Texas Constitution exclusively empowers the Texas Attorney General and the county attorneys with the vested duty to enforce the law and seek redress for violations of public rights. *See Dao v. Trinh*, 2024 WL 2069933, at *3 (Tex. Ct. App. May 9, 2024); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 464 (Tex. 1993) (Doggett, J., concurring in part). The

18

Texas legislature may not "divest" those attorneys of the executive power that the Texas Constitution assigns to them. *El Paso Elec. Co*, 937 S.W.2d at 439. Only Texans, through constitutional amendment, may do so. *See* Tex. Const. art. XVII (amendment process).

This Court should therefore hold that the TMFPA *qui tam* provisions violate Article II, Section 1, Article IV, Section 22, and Article V, Section 21 because the Texas Legislature's effort to give a private party the power to pursue public litigation violates the separation-of-powers principles enshrined in the State's Constitution.

### B. Federal Caselaw Reinforces the Conclusion that the TMFPA Is Unconstitutional.

If this Court were to find that the TMFPA *qui tam* provisions violate the Texas Constitution, it would be following a path already trod in proceedings involving the *qui tam* provisions of the comparable federal False Claims Act ("FCA"). These recent federal proceedings reinforce the conclusion that the TMFPA violates the Texas separation of powers.

The Texas Constitution reflects the same separation-of-powers principles as the federal Constitution. *See supra* Part I.B. That fact has led the courts of this State to look to federal precedent where persuasive and helpful when interpreting the Texas Constitution's separation of

19

powers. *See In re Abbott*, 628 S.W.3d 288, 296 (Tex. 2021) ("We frequently look to federal constitutional decisions when interpreting analogous state constitutional provisions."); *Mosley v. Texas Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019) (similar); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010) ("Texas courts look to analogous federal law in applying the state Act."); *Kinney v. Barnes*, 443 S.W.3d 87, 92 (Tex. 2014) ("[I]n interpreting our own constitution, we 'should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful.'" (citation omitted)); *Pidgeon v. Turner*, 538 S.W.3d 73, 83 (Tex. 2017) ("[Federal] decisions, particularly those regarding federal constitutional questions, can certainly be helpful and may be persuasive for Texas trial courts.").

Of course, Texas does not follow federal interpretations in lockstep. Rather, Texas courts must give due effect where, as here, the Texas Constitution provides for even more explicit protections than the federal counterpart. *See Ex parte Davis*, 957 S.W.2d 9, 12 (Tex. Crim. App. 1997) (en banc) ("We note initially that this Court, as well as the Texas Supreme Court, has held that the Texas Constitution gives greater

protection in some instances to Texas citizens than does its federal counterpart."); *Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 202 (Tex. Ct. App. 2008) ("[S]tate constitutions can, and often do, provide additional rights for their citizens.").

A few lower federal courts have upheld the constitutionality of the federal FCA. But those decisions predate a line of Supreme Court precedents over the past 20 years that have enforced the structural limits of the federal Constitution with renewed vigor. For example, in *Seila Law*, the Supreme Court held that Congress "violate[d] the separation of powers" by creating an independent agency led by a single director insulated from presidential removal. 591 U.S. at 205. And in *Lucia v. Securities and Exchange Commission*, the Court held that administrative law judges were "officers of the United States," who must be appointed in a presidentially accountable manner consistent with the Appointments Clause of the U.S. Constitution. 585 U.S. 237, 241 (2018); *see also Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (holding that a *qui tam* relator is not "appointed as an officer of the United States"). In those cases and others, the Court has

21

pushed back on Congress's attempts to diminish the President's control over the Executive Branch.

In light of these precedents, three Justices of the Supreme Court recently observed that "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II," because it too strips the President of his ability to exercise a part of the executive power of the United States. *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting); *see also id.* at 442 (Kavanaugh, J., joined by Barrett, J., concurring); *Wis. Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh, J., joined by Thomas, J., concurring). Since then, a federal court held that the FCA's *qui tam* provisions violate the Appointments Clause of the federal Constitution. *See Zafirov*, 751 F. Supp. 3d at 1300. As that court correctly concluded, *qui tam* laws violate Article II by stripping executive power from the executive branch and assigning it to private actors—in contravention of the Framers' decision to vest the entire "executive Power" in the President and properly appointed officers accountable before him. U.S. Const. art. II, § 1, cl. 1; *see id.* art. II, § 2, cl. 2.

The TMPFA's *qui tam* provisions likewise violate the Texas Constitution by shifting power to pursue redress for public wrongs from the Attorney General and county attorneys to private actors who are unaccountable to the Texas electorate. This Court is the "proper forum to hear the grave challenges to the Act that Novartis raises here." *Novartis*, 2025 WL 2979490, at \*4. And this Court should sustain those meritorious challenges.

## C. History Cannot Salvage the Texas *Qui Tam* Provisions' Affront to the Separation of Powers.

In federal court, a "primary counterargument" for upholding the federal FCA's *qui tam* provisions emphasizes the "historical pedigree of *qui tam* suits." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). Whatever purchase those arguments might have under Article II of the U.S. Constitution, they cannot save the *qui tam* provisions of the TMFPA. The TMFPA was amended to add its *qui tam* provisions very recently— in 2007. The State thus cannot rely upon historical provenance to counter the plain text of the Texas Constitution. *See* Pamela Bucy et al., *States, Statutes, and Fraud: A Study of Emerging State Efforts to Combat White Collar Crime*, 31 Cardozo L. Rev. 1523, 1542–43 (2010) (noting that

Texas is one of many States "relatively new to the world of qui tam litigation").

In all events, the historical roots of federal *qui tam* are limited at best, and they do not support the federal constitutionality of the FCA's *qui tam* provisions, much less the constitutionality of the TMFPA under the Texas Constitution.

Many of the early federal *qui tam* enactments operated differently than the current FCA, which allows unharmed plaintiffs to "stand[] in the government's shoes" and litigate on the people's behalf. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006). Most of the early statutes offered only a reward to informers for bringing a matter to the government's attention, without providing a cause of action to sue on behalf of the sovereign. *See, e.g.*, Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48 (penalties against collectors, naval officers, and surveyors who failed to take an oath or display rate tables, with a bounty to the informer); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (similar for a maritime law); Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177 (similar for a customs law); Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67 (penalties for Treasury Department officials who violated conflict-

24

of-interest and bribery prohibitions, with a bounty to the informer); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195–96 (penalties for agents of the United States Bank that engaged in improper trading practices, with a bounty to the informer).

Others merely sought to redress private injuries, with only incidental recoveries flowing to the government. *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (giving half of statutory penalty to authors who sued for copyright infringement of their works, with other half to the government); Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131 (giving, on top of damages, half of statutory penalty to seamen or mariners deprived of pre-departure shipping contracts, with other half to the government).

As to the few enactments that allowed informers to pursue the sovereign's claims, *see Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777 n.6 (2000), these provisions "were essentially stop-gap measures, confined to narrow circumstances" to assist the fledging Executive, *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 213 (1989) (William P. Barr, Ass't Att'y Gen.) ("OLC Memo"). And the "transitory and aberrational" *qui tam*

25

device "never gained a secure foothold within our constitutional structure." *Id.* It produced "little actual litigation." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 728 (2004). There is "no evidence" that Congress ever "considered the constitutional status of qui tam." OLC Memo, *supra*, at 214. And, "[w]ithin a decade, 'the tide had turned against' qui tam," leading Congress to "curtail[] its use." *Id.* at 235–36 (alterations adopted) (quoting Leonard D. White, *The Federalists* 417 (1956)).

Congress quickly abandoned the practice for good reason. English history had demonstrated that *qui tam* is "a vexatious device that ultimately could not be reconciled with the institutions of free and responsible government." OLC Memo, *supra*, at 235. The persons "occupied in this branch of executive jurisprudence" did not "give impartial efficiency to the laws," but acted instead as "instrument[s] of individual extortion, caprice, and tyranny." 8 Legal Observer No. 204, at 20 (1834) (citation omitted). Informers unearthed old and forgotten statutes "as means to gratify ill-will." 4 William S. Holdsworth, *A History of English Law* 356 (1923). They threatened enforcement suits to "levy[] blackmail" against potential defendants. *Id.* And they stirred up

litigation simply in the hopes of recovering money. *Id.* These abuses led to considerable outrage—prompting Lord Coke to denounce the informers as "viperous vermin" who "vex and depauperize the subject" for "malice or private ends, and never for love of justice." 3 Sir Edward Coke, *Institutes of the Laws of England* 194 (4th ed. 1797).

Decades after the Founding, Congress revived *qui tam* litigation by adopting the original version of the FCA during the Civil War. But those *qui tam* provisions too "fell into relative desuetude" once the Civil War crisis receded. OLC Memo, *supra*, at 209. These scattered historical episodes thus cannot excuse the manifest conflict between the FCA's *qui tam* provisions and the text, structure, and history of Article II of the Constitution—much less justify the *qui tam* provisions of the TMFPA.

A few historical antecedents cannot wash away *qui tam*'s constitutional shortcomings in any event. After all, "[t]he Constitution, not history, is the supreme law." OLC Memo, *supra*, at 233; *see N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (stressing that "the text controls" when "later history contradicts what the text says"). The "basic principle" of constitutional interpretation is that the document controls over "contrary historical practices," *United States v. Rahimi*, 602

27

U.S. 680, 718 n.2 (2024) (Kavanaugh, J., concurring), meaning that, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees," *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see Zafirov*, 751 F. Supp. 3d at 1317–20. That holds true even for a historical practice that "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).

And, of course, federal historical practice could not cure infirmities under the Texas Constitution. The "guiding principle when interpreting" that document "is to give effect to the intent of the voters who adopted" it. *In re Dallas Cnty.*, 697 S.W.3d 142, 158 (Tex. 2024) (quoting *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 594 S.W.3d 309, 313 (Tex. 2020)). As described above, the Texas voters who ratified the Texas Constitution's separation-of-powers provisions intended to give the Texas Attorney General and the county attorneys the exclusive power to seek remedies for public wrongs. No amount of history can alter that fact.

## PRAYER

This Court should issue a writ of mandamus directing the district court to dismiss HSG's claims brought under the *qui tam* provisions of the TMFPA.

Dated: November 21, 2025   Respectfully submitted,

/s/ *Lindsey Cohan*

LINDSEY COHAN
DECHERT LLP
515 Congress Ave.
Suite 1400
Austin, TX 78701

Steven A. Engel
   (*Pro Hac Vice* Application Pending)
Michael H. McGinley
   (*Pro Hac Vice* Application Pending)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006

## CERTIFICATE OF SERVICE

I certify that on November 21, 2025, a true and correct copy of the foregoing brief has been served on counsel of record for all parties through electronic service.

/s/ *Lindsey Cohan*
Lindsey Cohan

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Texas Rule of Appellate Procedure 9.4(i) because, according to Microsoft Word, it contains 5,684 words, excluding exempted parts.

/s/ *Lindsey Cohan*
Lindsey Cohan

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lindsey Cohan
Bar No. 24083903
lindsey.cohan@dechert.com
Envelope ID: 108357607
Filing Code Description: Other Brief
Filing Description: Brief of Amicus Curiae U.S. Chamber of Commerce in Support of Petitioner
Status as of 11/21/2025 4:49 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Deron Dacus | 790553 | ddacus@dacusfirm.com | 11/21/2025 4:39:23 PM | SENT |
| Jonathan Wilkerson | 24050162 | jonathan.wilkerson@lanierlawfirm.com | 11/21/2025 4:39:23 PM | SENT |
| Samuel Baxter | 1938000 | sbaxter@mckoolsmith.com | 11/21/2025 4:39:23 PM | SENT |
| Zeke DeRose | 24057421 | zeke.derose@lanierlawfirm.com | 11/21/2025 4:39:23 PM | SENT |
| Jennifer Truelove | 24012906 | jtruelove@mckoolsmith.com | 11/21/2025 4:39:23 PM | SENT |
| Alex Brown | 24026964 | alex.brown@lanierlawfirm.com | 11/21/2025 4:39:23 PM | SENT |
| Lynne Kurtz-Citrin | 24081425 | lynne.kurtz-citrin@oag.texas.gov | 11/21/2025 4:39:23 PM | SENT |
| Eric B.Halper | | ehalper@mckoolsmith.com | 11/21/2025 4:39:23 PM | SENT |
| Radu A. Lelutiu | | rlelutiu@mckoolsmith.com | 11/21/2025 4:39:23 PM | SENT |
| W. Mark Lanier | | WML@LanierLawFirm.com | 11/21/2025 4:39:23 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 11/21/2025 4:39:23 PM | ERROR |
| Ross Galin | | rgalin@omm.com | 11/21/2025 4:39:23 PM | SENT |
| Meredith Garagiola | | mgaragiola@omm.com | 11/21/2025 4:39:23 PM | SENT |
| Anton Metlitsky | | ametlitsky@omm.com | 11/21/2025 4:39:23 PM | SENT |
| Danny S.Ashby | | dashby@omm.com | 11/21/2025 4:39:23 PM | SENT |
| Jonathan D. Bonilla | | Jonathan.Bonilla@oag.texas.gov | 11/21/2025 4:39:23 PM | ERROR |
| Litigation Calendar | | litigationcalendar@omm.com | 11/21/2025 4:39:23 PM | SENT |